## KRAFT v. WILSON.

### No. 18,281; September 14, 1894.

#### 37 Pac. 790.

**Agency.**—As the Ratification of an Agent's Act is equivalent to a prior command, a finding that an agent had authority to do an act is sustained by evidence that his principal ratified such act.

**Agency.**—The Question of Ratification of an unauthorized act of an agent is a question of fact.[1]

**Agency—Estoppel to Deny Authority.**—Plaintiff Purchased from Defendant's Son in Law certain stock, part of which belonged to him and defendant and part to defendant and his son, and all of which were running on the same ranch, and credited the amount on the son in law's account with him. Defendant, being told of the sale, gave other stock to his son, to satisfy him, but did not say anything to plaintiff, who had previously purchased stock from the son in law under similar circumstances, as was known to defendant. Defendant took an assignment from his son in law of all his interest in the stock on the ranch, and made several payments on what he himself owed plaintiff, and for which he had given his note, and also told him that his son in law had plenty of property to pay his debt, and at last gave him a mortgage two years after the sale to secure a balance he owed plaintiff. Held, that defendant, who had become the assignee of his son's interest, could not deny the son in law's authority to sell the stock belonging to defendant and his son.

---

1 Cited and followed in Union Trust etc. Co. v. Best, 160 Cal. 267, 116 Pac. 738, where, alluding to facts brought out, the court said: "We find in the record further evidence which is ample to sustain an inference that the Burck-Gwynn Company subsequently ratified Edmison's acts. Such ratification is equivalent in effect to precedent authorization."

APPEAL from Superior Court, Tehama County; John F. Ellison, Judge.

Action by Herbert Kraft against H. C. Wilson. There was a judgment for plaintiff and defendant appeals. Affirmed.

Johnson & Chase and Reddy, Campbell & Metson for appellant; N. P. Chipman and L. V. Hitchcock for respondent.

SEARLS, C.—This is an action upon a promissory note made by the defendant December 1, 1888, for $7,981, payable to plaintiff or his order one day after date, with interest at nine per cent per annum, and in case of a suit for the collection thereof with five per cent upon the amount found due as attorneys' fees. Plaintiff claims a balance due of $3,838, besides interest, and $191.90 as attorneys' fees and costs. Defendant answered, admitting the execution and validity of the note, and set up two counterclaims, aggregating $5,937.50. These counterclaims were disallowed by the court and judgment rendered in favor of plaintiff, from which, and from an order denying defendant's motion for a new trial, he appeals.

The whole case turns upon the validity of defendant's counterclaims. The cause was tried by the court without a jury, and the facts as found, bearing upon the questions involved, although lengthy, are essential to an understanding of the case, and are as follows:

"(1) That said C. G. Alexander is a son in law of defendant, and was so related to defendant ever since 1880; and the said H. F. Wilson was a son of H. C. Wilson, and that said H. F. Wilson is now deceased.

"(2) That the defendant owns, and has for many years owned, a large body of land in Warner valley, in the state of Oregon, used as a stock ranch, upon which he raised horses, mules and cattle.

"(3) That some years prior to 1883 the defendant and C. G. Alexander entered into a contract, by the terms of which the defendant let Alexander have charge of a number of mares and cattle. Alexander was to run these animals on the said Warner Valley ranch, and at the expiration of the lease or contract was to return to the defendant the same number of animals he had originally received; that is, to make the old

stock good, and the balance, or the increase, was to be owned equally by the defendant and C. G. Alexander. In 1883 the defendant and Alexander had a settlement under the terms of their contract. All the animals at that time were branded with the 'heart' brand. In this settlement the animals that were counted out to make the old stock good were branded with the 'bar-heart' brand, to distinguish them from what might be termed the increase. The defendant then turned over to his said son, H. F. Wilson, all animals branded with the 'bar-heart' brand upon a contract by which said H. F. Wilson was to run the 'bar-heart' stock on the said Warner Valley ranch on shares, to pay all the expenses of running them, and at the end of the contract make the old stock good, and divide the increase between his father, the defendant and himself. The 'heart' brand animals, of which C. G. Alexander was the owner of one-half, were then turned over to the said C. G. Alexander under a contract by which he was to run them on shares on the Warner Valley ranch, pay all the expenses of running them, and divide the increase equally between himself and the defendant, H. C. Wilson. All the stock in which H. F. Wilson was interested with defendant, and that in which C. G. Alexander was interested with the defendant—the animals branded with the 'heart' brand and those branded with the 'bar-heart' brand—ran promiscuously upon the Warner Valley ranch.

"(4) Accounts for supplies for the ranch were run at various stores in which supplies for all the ranch and all the stock upon it were charged, without any attempt to segregate the expenses incident to running the stock that H. F. Wilson had on shares from the expenses of the stock that C. G. Alexander had on shares.

"(5) From 1883 to 1889 H. F. Wilson was most of the time on the Warner Valley ranch, and while there had chief control of affairs. About 1889 he left, and did not return. A hard winter came, and destroyed ninety per cent of the stock. H. F. Wilson and his father had no settlement, and H. F. Wilson, after the hard winter, practically abandoned the Warner Valley enterprise.

"(6) From the year 1884 up to the bringing of this action H. F. Wilson, C. G. Alexander and H. C. Wilson did a large banking business with H. Kraft, the plaintiff. H. F. Wilson

created an individual indebtedness with the plaintiff. C. G. Alexander created a large individual indebtedness with the plaintiff, and H. C. Wilson had an individual indebtedness with the plaintiff. In 1884, at the request of H. C. Wilson, an account was opened with H. Kraft under the name of H. C. Wilson and Alexander. The account ran along, until in March, 1886, it had grown quite large, amounting to over $7,000, when the defendant gave a note to the plaintiff, signed 'H. C. Wilson and Alexander,' in settlement of the account to that date. After this, checks continued to be drawn against the H. C. Wilson and Alexander account up to December 1, 1888. In September, 1886, H. C. Wilson paid the note in full of March, 1886. December 1, 1888, the amount of the H. C. Wilson and Alexander account had reached the sum of $7,981. On that day H. C. Wilson, at the request of plaintiff, gave his individual note for that amount, and the account of H. C. Wilson and Alexander was credited with the same amount, and closed. This note of December 1, 1888, is the one upon which this action is brought.

"(7) In the meantime the individual account of C. G. Alexander with the plaintiff had been growing from year to year. Some settlement of accounts had been made by Alexander by giving his individual notes. In September, 1890, he owed H. Kraft in all about $17,000.

"(8) In August, 1890, there was upon the Warner Valley ranch a large number of horses, mules, and cattle. The stock was in three different brands; some branded with a 'heart,' some with a 'bar-heart,' and some branded 'A. X.' H. C. Wilson and C. G. Alexander each owned an undivided one-half interest in the 'heart' brand animals. H. C. Wilson and H. F. Wilson each owned an undivided half interest in the 'bar-heart' brand animals, and C. G. Alexander owned the 'A. X.' brand animals.

"(9) In August, 1890, C. G. Alexander was in Warner Valley in charge of the ranch and all the stock on it, regardless of brands. During all the year 1890, H. C. Wilson resided, and for many years prior thereto had resided, in Tehama county, California, in which county H. Kraft also resided, and also H. F. Wilson. The defendant went to the Oregon ranch once or twice a year, and there remained from one to three weeks.

"(10) In August, 1890, forty-nine head of mules from the Warner Valley ranch were at Lakeview, Oregon, in possession of one Hereford, and held by him under a chattel mortgage signed 'Wilson & Alexander,' to secure a debt of over $2,100, due Cogswell & Ross, of Lakeview, jointly owned by H. C. Wilson and C. G. Alexander. The signatures thereto were written by Alexander, and at the time of their execution H. C. Wilson did not know of their execution.

"(11) In August, 1890, the plaintiff, being desirous of having something paid on the C. G. Alexander indebtedness to him, sent a man by the name of Estes to buy mules of Alexander, and credit the amount agreed to be paid upon Alexander's indebtedness. Estes, in pursuance of his employment, bought of Alexander thirty-three mules branded with a 'barheart,' twenty-nine mules branded with a 'heart,' and twelve mules branded 'A. X.' For part of these mules he agreed to pay $80 per head, and for a part $85 per head. Two thousand one hundred dollars were paid in cash to release the mules that were in pledge in Lakeview, Oregon, which mules were a part of his purchase, and the balance of the purchase price was credited on the individual indebtedness of C. G. Alexander to plaintiff.

"(12) After the purchase of said mules they were driven to Tehama county, California, and delivered to the plaintiff.

"(13) After the sale of the said mules, and after they had been delivered to the plaintiff, defendant, in September, 1890, went to Oregon, and had an interview with C. G. Alexander, at which time he was informed of the sale of the mules to plaintiff, and also as to what disposition had been made of the proceeds.

"(14) Defendant, H. C. Wilson, then took a bill of sale from C. G. Alexander of all his interest in the stock on the Warner Valley ranch in part payment of a large indebtedness due him (defendant) from Alexander.

"(15) Upon his return to Tehama county soon after, defendant had an interview with his son, H. F. Wilson, in which, for the purpose of preventing H. F. Wilson from informing plaintiff that he (H. F. Wilson) had an interest in a part of the mules sold to him by Alexander, he (defendant) let H. F. Wilson have mules of his to satisfy him (H. F. Wilson) for the mules Alexander had sold, and thereby prevent his

(H. F. Wilson) saying to the plaintiff that Alexander had sold to plaintiff mules he had no authority or right to sell.

" (16) In November, 1890, defendant, at the request of plaintiff, gave to plaintiff a crop mortgage for the full amount of the note now being sued upon. After the execution of this mortgage defendant paid upon the said note as follows: July 11, 1891, $320.62; August 26, 1891, $1,833.05; December 26, 1891, $3,592.66; in all, $5,746.33.

" (17) June 5, 1891, defendant Wilson was again at Warner Valley, Oregon, and had an interview with C. G. Alexander, at which time Alexander gave to defendant a letter addressed to H. Kraft, in the following words and figures:

" 'Warner, June 5, 1891.

" 'H. Kraft:

" 'The mules I sold you last year, one-half of thirty-three head of "hearts," sixteen and a half, and the thirty-one "bar-hearts," I had no right to sell. Please turn them over to H. C. and H. F. Wilson.

" 'C. G. ALEXANDER.'

"In a few days thereafter defendant returned to Tehama county, where he then resided, and where he has resided for many years, bringing the above letter with him. He did not deliver it to plaintiff nor inform him of its contents, but kept it until a day or two before this case was commenced, to wit, until January 21, 1892, when he handed it to one of his attorneys, who afterward read it to Mr. Kraft.

" (18) On June 21, 1891, C. G. Alexander and the plaintiff, had a settlement, and on that day C. G. Alexander mailed to the plaintiff a new note for what he then owed the plaintiff. In arriving at the amount of this new note, what was agreed to be paid for the mules (less $2,100) had been deducted from the total indebtedness of the said Alexander, and the note was sent for the balance. Alexander signed this new note, and on the twenty-second day of June, 1891, inclosed it in a letter, and it reached the plaintiff in due course of mail.

" (19) During the summer and fall of 1891 defendant continued to make payments on the note now in suit, and several times had the plaintiff's bookkeeper figure up the amount due. As late as November 14, 1891, plaintiff wrote to defendant about the balance then due on note in suit, and told him he was getting tired of waiting for his money. In response to

this letter, defendant came up and said he was not ready to sell the wheat. Prices were not high enough to suit. He would like to hold on a little longer. Had plaintiff's book-keeper figure up how much the wheat would bring at a certain price, and how much that note amounted to, and talked about turning over some wheat that Harry had as further security. He didn't say a word at that time about H. Kraft owing him anything for mules. Again, after the 28th of December, in response to another letter from the plaintiff, the defendant came up again. He told Kraft, the plaintiff, that Harry was going to let him have the wheat, and he was going to sell it, and pay the money in, and talked about some wool he had— something he was going to turn also. On December 26, 1891, the defendant sent to plaintiff wheat receipts amounting to $3,599.66, for which he was given credit on the note in suit. This left a sum due to plaintiff from defendant, H. C. Wilson, much less in amount than the sum now claimed in the said defendant's counterclaim to be due from the said plaintiff to the said defendant.

"(20) At no time from August 9, 1890, to January 22, 1892, did defendant make any claim for the mules, or intimate that C. G. Alexander had done anything he did not have full authority to do."

The foregoing are special findings, and are in addition to the general findings in the case in which it is found that Alexander had authority to sell the mules, etc.

From the findings, the court below concluded as matter of law "that the defendant, by his subsequent acts, conduct, and silence, as set forth in the above findings, has ratified the sale of all the mules sold by Alexander to the plaintiff, and should not now be permitted to question the validity of said sale." The propriety of this conclusion involves the important question in the case. "Ratification is the adoption of a previously formed contract, notwithstanding a vice which rendered it relatively void; and, by the very nature of the act of ratification, confirmation, or affirmance, the party confirming becomes a party to the contract": Herman on Estoppel, p. 1157. Where ratified by the principal, the unauthorized act of his agent is as binding upon him as though previous authority had been conferred upon such agent. The subsequent ratification has a retrospective effect, and is equivalent to a prior com-

mand.   To say that an agent entered into a contract without authority from his principal, and that the principal subsequently ratified such contract, is, in legal intendment and effect, the equivalent of saying the agent was duly authorized to make the contract.   The question of whether a contract made by an agent, or by one purporting to be such, has been ratified or adopted by the principal is one of fact, to be determined by a jury or by the court sitting in lieu thereof. Therein it differs from an estoppel in pais, which is a legal consequence—a right arising from acts or conduct: Bigelow on Estoppel, 4th ed., p. 447.   A full knowledge by the principal of all the material facts is a prerequisite to a finding that such principal has by his silence, acts or declarations in fact adopted the contract: Wharton on Agency; sec. 65.   The evidence which will authorize an assumption of ratification is or may be anything which convinces the mind of the intention on the part of the principal to adopt or approve the act, thus: (1) A principal who permits an unauthorized agent to act for him, and who stands by without interference while third persons deal with such agent as agent, cannot afterward dispute the authority of such agent.   (2) Silence of the principal when informed that the agent has entered into obligations in his name indicates acquiescence.   (3) Proof of ratification may be inferred.   We may infer ratification when the acts and conduct of the principal are inconsistent with any other theory than that he intended to ratify the transaction. It may be said, generally, that any act, conduct or declaration from which an intent on the part of the principal to adopt the act of the agent appears is sufficient.   Ratification being, as before stated, a fact, and the court having found thereon in favor of plaintiff, such finding must be upheld if supported by the evidence.   The language of the general finding is "that said C. G. Alexander had authority to make said sale."   The retrospective effect of a ratification is to place the contract and the contracting parties in the same position as though previous authority had been given; hence, if there was in fact proof of such ratification, the court was authorized to find the authority as stated in the finding.

Turning to the record, and we think the findings have substantial support in the evidence.   Twelve of the mules purchased by plaintiff from Alexander were the property of the

latter, and no question can arise as to them. As to the thirty-three mules included in the same purchase, owned by defendant and Alexander jointly, there was certainly evidence tending to show that Alexander had authority to make the sale, and hence to support the finding of the court to that effect. That Alexander held a power of attorney from the defendant, authorizing him to transact all business at the ranch in Oregon, seems conceded. The precise date at which this power was revoked (if revoked at all by the defendant) is left in doubt. Alexander, testifying as a witness, says: "I thought I had authority from H. C. Wilson to sell to Kraft or to anyone else his half interest in the mules branded with the straight 'heart.' My opinion is based upon previous actions between us, and business matters. I had authority at one time so to sell—that is, up to three or four years ago—two years ago. It was a power of attorney to transact any and all business for him and in his name. It embraced everything, I supposed. Whether it embraced the stock or not, I do not know. It was a written authority. I have not the instrument. I had authority about eight years. It ceased about two years ago, when Mr. Wilson put that notice in the paper that he would not be responsible for any person in this county." Wilson himself testified that he published the notice in the paper after the sale of the mules to plaintiff. It is true, the extent of the authority under this power does not clearly appear, but, as I do not find that the defendant, who testified at length on his own behalf, and referred to the power, denies that it authorized a sale of stock, it is believed the court below was warranted in finding from all the circumstances that as to the mules branded with a "heart" Alexander had authority to sell. As to the mules branded with what is called a "bar-heart," and which were owned by defendant and his son, H. F. Wilson, no previous authority in Alexander to sell appears, and the sole question presented is as to the fact of ratification by the defendant, who is the assignee of his son, of all the interest of the latter therein. To discuss the testimony at length in support of the finding can subserve no useful purpose beyond the decision of the present case, and as the conclusion is irresistible that, although there is a substantial conflict in the testimony, there is yet such a showing in favor

of the ratification by defendant of the sale that this court is not warranted in disturbing the finding.

If, however, it be conceded that where one has wrongfully taken the property of another, and sold it, not as agent, but on his own account, mere silence on the part of the owner does not confirm the sale, and that the confirmation must rest upon some consideration upholding it, or upon an estoppel—a question upon which the authorities are divided—still the evidence and the special findings are, as it is believed, sufficient to uphold the judgment. It is not the silence alone of the defendant, relied upon, but the care which he took to prevent knowledge of the true state of the case from coming to the plaintiff; his payments made upon the promissory note, when, if he claimed what he now sets up as a counterclaim, there was nothing due thereon; his giving a chattel mortgage to secure the amount due upon the note; his silence for nearly a year and a half, with full knowledge of all the facts, coupled with his declarations to plaintiff, as disclosed by the evidence, that Alexander was perfectly good for the amount he owed the plaintiff, had plenty of property, etc., at a time when he, the defendant, had an assignment of all of Alexander's interests in the stock, whereby plaintiff was lulled into security, and to take a new note extending credit to Alexander; and other minor circumstances indicating an intention to abide by the action of his son in law in the sale which the latter had made. That the testimony as to some of these facts was conflicting does not authorize us to discard the findings. Taken together, they bring the case within the rule enunciated by the lord chancellor before the house of lords in Cairncross v. Lorimer, 7 Jur., N. S., 149, where he said: "I believe, in the laws of all civilized nations, that if a man, either by words or by conduct, has intimated that he consents to an act which has been done, and that he will offer no opposition to it, although it could not have been lawfully done without his consent, and he thereby induces others to do that from which they otherwise might have abstained, he cannot question the legality of the act he had sanctioned, to the prejudice of those who have so given faith to his words, or to the fair inference to be drawn from his conduct." Or, as was said in Nicholson v. Hooper, 4 Mylne & C. 179, by Lord Cottenham: "A party claiming a title in himself, but privy to the fact of another dealing with

the property as his own, will not be permitted to assert his own title against a title created by such other person, although he derives no benefit from the transaction." That defendant, in the face of the testimony to the numerous sales made by Alexander of stock from the ranch, was aware that the latter "was dealing with the property as his own," cannot be doubted. Plaintiff had previously purchased stock from Alexander under circumstances that may reasonably be assumed to have been known to the defendant, yet the latter offered no objection. Indeed, it appears from some of the testimony that defendant, his son and Alexander in many respects acted as ostensible partners in all the stock, and in other respects acted as though they were severally owners of it.

Numerous objections were made to the introduction of testimony and to the refusal of the court to permit questions to be answered, but I fail to see that any of the errors assigned to the rulings of the court in this respect are well founded. A large number of these exceptions are based upon the action of the court touching testimony going to show that defendant and Alexander were copartners in the stock and in the business of conducting the ranch. As the court did not find a partnership to exist between the parties, such exceptions become unimportant. The exception urged in the brief of appellant, founded upon the refusal of the court below to permit defendant to testify as to how the account stood between Alexander and himself after witness received an assignment of Alexander's interest in the stock, is of no moment, for the reason that in answer to the very next question defendant was permitted to answer that the stock assigned to him did not pay his demand against Alexander by $30,000. So, too, the objection that defendant was not permitted to testify that his only knowledge of the sale was that Alexander had sold the stock as his own, and not as agent for defendant, was immaterial, for the reason that all the testimony tended to show that, whatever the authority of Alexander may have been as to a portion of the stock sold, he in fact sold it in his own name, and not in the name of or as the agent of defendant; and there is nothing in the findings in conflict therewith. There are other exceptions to evidence, but they are of no

greater moment than those noticed, and need not be reviewed. The judgment and order appealed from should be affirmed.

We concur: Belcher, C.; Haynes, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order appealed from are affirmed.